UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff/Appellee,

   v.

KAREN SUE LOWRY,

        Defendant/Appellant.

————————————————————————/

NO. CR. S-05-399 LKK

O R D E R

Karen Lowry, defendant, appeals her criminal conviction of occupying National Forest System land for residential purposes without authorization.  Defendant was convicted after a two-day trial before a magistrate judge.  Defendant contends that the government failed to prove beyond a reasonable doubt that defendant's occupancy was not authorized under the doctrine of individual aboriginal title.  Defendant also claims that the trial court erred in precluding her from introducing evidence that she was denied due process with respect to her application for an allotment (which would have authorized her use of the land).  The

1

1 | Karuk Tribe of California filed an amicus brief in the case.

2 | Defendant is a member of the Karuk tribe.

3 | **I.**

4 | **BACKGROUND & FACTS**

5 | **A.   PROCEDURAL HISTORY**[1]

6 | On August 8, 2003, the government filed an Information

7 | charging defendant with twenty-three separate counts, including:

8 |     COUNT ONE:        [16 U.S.C. § 551 and 36 C.F.R. §
9 |                       261.10(k) – Using and Occupying National
                          Forest System Land Without Special-use
                          Authorization]

10 |         The United States Attorney charges: THAT

11 |                         KAREN SUE LOWRY,

12 |
13 |     defendant herein, beginning no later than on or about
        November 20, 1997, and continuing through the date of
14 |     the filing of this Information, in the County of
        Siskiyou, State and Eastern District of California, did
15 |     possess, use, and occupy National Forest System Land
        without a special-use authorization, when such
16 |     authorization is required, to wit: establishing and
        maintaining a residential area in Township 11 North,
17 |     Range 6 East, on the Klamath National Forest, in
        violation fo Title 16, United States Code, Section 551,
18 |     and Title 36, Code of Federal Regulations, Section
        261.10(k), a misdemeanor.

19 |     COUNT TWO:        [16 U.S.C. § 551 and 36 C.F.R. §
20 |                       261.10(b) – Possessing, Occupying, and
                          Using National Forest System Lands for
                          Residential Purposes]

21 |         The United States Attorney further charges: THAT

22 |                         KAREN SUE LOWRY

23 |
24 |     defendant herein, beginning no later than on or about
        November 20, 1997, and continuing through the date of
25 |     the filing of this Information, in the County of

26 |     [1]   Adopted from the parties' papers.

2

1
2
3
4
5

> Siskiyou, State and Eastern District of California, did take possession of, occupy, and otherwise use National Forest System Land without a special-use authorization and without being otherwise authorized by federal law and regulation, to wit: establishing and maintaining a residential area in Township 11 North, Range 6 East, on the Klamath National Forest, in violation of Title 16, United States Code, Section 551, and Title 36, Code of Federal Regulations, Section 261.10(b), a misdemeanor.

6   Excerpts of Record ("ER") Tab 1, (Information filed August 8,

7   2003).  Defendant pleaded not guilty to all charges.

8       Prior to trial, the parties agreed that the government would

9   pursue only the first two counts of the Information and that if

10  defendant were convicted of either count the punishment would not

11  exceed probation with abatement (leaving the property) and that the

12  government would be entitled to seek restitution if abatement did

13  not occur within a defined period of time.   ER Tab 2, Reporters'

14  Transcript ("RT") of Jan. 27, 2005 Status Conference, at 7.

15      On May 18, 2005, the court granted the government's motion <u>in</u>

16  <u>limine</u> to exclude evidence that the government's denial of her

17  application for an Indian Allotment was arbitrary and capricious.

18  RT of May 18, 2005 Hearing, at 11.  A bench trial was held on May

19  23rd and 24th, 2005.

20      On August 30, 2005, the magistrate judge issued a 23-page

21  "Decision and [Proposed] Judgment" ("Decision"), in which he found

22  the defendant guilty.   ER Tab 25, Decision.  On September 27,

23  2005, the magistrate judge held a sentencing hearing and issued a

24  sentence that required defendant to leave the land in question by

25  April 30, 2006.  ER Tab 26, RT of Sept. 27, 2005 Sentencing

26  Hearing, at 27.  Defendant timely filed a Notice of Appeal on

1  September 29, 2005.  ER Tab 27, Clerk's Record ("CR") 1 (Appeal of

2  Magistrate Judge's Decision).  Pursuant to this Court's July 21,

3  2006 order, defendant's sentence is stayed pending a ruling on the

4  merits of the appeal.

5  **B.   EVIDENCE PRESENTED AT TRIAL**

6        **1.   <u>The Property at Issue</u>**

7        This matter relates to an area of land in the Klamath National

8  Forest.  This area is known as the Oak Bottom area and is located

9  along the Salmon River in Northern California.  The magistrate

10 judge defined the following terms that this court hereby adopts:

11 •  <u>Oak Bottom</u>**:** A recognized general geographical area within the

12    Klamath National Forest.  Oak Bottom encompasses a Forest

13    Service  Campground  and  work  center  ("Forest  Service

14    Compound").  Allotment 280 and the area around defendant's

15    current residence are also within Oak Bottom.

16 •  <u>Indian Allotment 280</u>: Private property located within Oak

17    Bottom, consists of approximately 6.5 acres and the site of

18    Bessie Tripp's residence.

19 •  <u>Defendant's residence</u>**:**  The  defendant's  residence  and

20    curtilage.  Defined in Counts One and Two of the information

21    filed by the government.  The residence is approximately

22    fifty yards from Allotment 280.

23       The court notes at the outset that there is a certain amount

24 of confusion as to which exact piece of property is at issue in the

25 case.  Counts one and two of the Information filed by the

26 government allege that the defendant established and maintained a

4

1  "residential area in Township 11 . . . ."  ER Tab 1, Information

2  filed August 8, 2003, at 2.  Thus, the only land at issue is the

3  residential area, i.e., the plot of land where defendant's

4  residence is currently located and the curtilage.  Interestingly,

5  neither party discusses the exact extent of defendant's curtilage,

6  a fact the court considers important.  For example, it is not clear

7  if the curtilage of defendant's home extends into the area of the

8  allotment.  For the reasons discussed, however, this factual issue

9  does not preclude the court from reaching a decision in this case.

10      **2.   Defendant's Occupancy of the Property at Issue[2]**

11      The facts of the case are, for the most part, agreed upon by

12  the parties.  Defendant's grandmother, Bessie Tripp, and Bessie's

13  parents and grandparents were all born in the Oak Bottom area in

14  which defendant now lives.  ER Tab 14, Def.'s Ex. Q, at 3-4; ER Tab

15  21, Def.'s Ex. BB, at 1; ER Tab 5, RT of May 23, 2005 trial

16  proceedings, at 54:22-24, 101:16-17, 121:1-6.

17      Defendant's great-great grandmother, Mahkhawa'da, lived in a

18  two-story log cabin on the site where defendant now lives.  ER Tab

19  15, Def.'s Ex. R, at 1.  Mahkhawa'da was driven off the land by

20  miners in the early 1900s and the site was used as a post office.

21  ER Tab 15, Def.'s Ex. R, at 2; ER Tab 20, Def.'s Ex. AA.

22  Mahkhawa'da later returned to the site of her original home, which

23  is the area where defendant now lives. ER Tab 5, RT of May 23, 2005

24  trial proceedings, at 121:6.  Defendant's great grandfather, Nupas

25

26      [2]  Adopted from the parties' papers.

1   also lived on the Oak Bottom area.   ER Tab 21, Def.'s Ex. BB.

2        Bessie Tripp, defendant's paternal grandmother, was born some
3   time in the 1860s or 1870s on the piece of land that would later
4   become Allotment 280. ER Tab 5, RT of May 23, 2005 trial, at
5   101:15-102:11; ER Tab 21, Def.'s Ex. BB.   She considered it her
6   home throughout her life.   ER Tab 21, Def.'s Ex. BB.   Bessie Tripp
7   lived on the Oak Bottom property exclusively until 1899, when she
8   went to school in Hoopa.   ER Tab 5, RT of May 23, 2005 trial
9   proceedings, at 55:6-7.   She would still, however, come home on the
10  weekends and during the summer to dry fruit from the trees her
11  grandfather Nupas had planted in the area.   Id. at 55:9-13.   Bessie
12  married William Tripp around 1901.   Id. at 56:9-10.   While Bessie
13  joined William at the mines for periods of time, in the summers she
14  would return to the Oak Bottom area to gather fruit and can or dry
15  it and tend to her garden.   Id. at 140:20-24.   Bessie always viewed
16  the Oak Bottom area as her home.   Id. at 161:12-13.

17       In 1926, Bessie Tripp began to permanently reside in a house
18  located on property that later become Indian Allotment 280.   Bessie
19  and her family did not regard the boundaries of Allotment 280 as
20  the boundaries of their home; instead, they treated the larger Oak
21  Bottom area, including the land on which defendant now resides, as
22  their home. As Rhonda Tripp, defendant's sister-in-law, testified,
23  the family "just did everything that had to do with life, cut wood,
24  cut poles for use in construction, gathered tea, mushrooms, acorns,
25  roots and basket-making materials" in the area surrounding Bessie's
26  home.   Id. at 107:14-19; see also id. at 64:16-65:11, 109:8-17.

1  This area included the area where defendant now lives.

2       On or near the land where defendant now lives, Bessie and her

3  family maintained a garden and raised livestock, as well as

4  gathered grass and acorns.  ER Tab 15, Def.'s Ex. R, Bates at 2;

5  ER Tab 5, RT of May 23, 2005 trial proceedings, at 65:4-66:19.  The

6  family also harvested grapes and picked apples that grew near where

7  defendant currently resides. ER Tab 5, RT of May 23, 2005 trial

8  proceedings, at 108:11-18; 110:23-111:8.

9       Bessie and her family treated the area around allotment 280,

10  which included defendant's current residence, as if it were their

11  own property.  Strangers needed Bessie's permission to enter the

12  land.  Id. at 112:10-21, 167:18-20.  Bessie Tripp and her family

13  would run outsiders who did not have her permission to be on the

14  land off of the property.  Id. at 68:11-13.  Bessie Tripp remained

15  in the Oak Bottom area until her death in December of 1982.  Id.

16  at 34:14.

17       Defendant spent her childhood with Bessie on the property that

18  would later become Allotment 280.  When she was 12, defendant was

19  placed in foster care.  Id. at 7:8-10; 58:3-5; ER Tab 24, RT of May

20  24, 2005 trial proceedings, at 4:12-14.  As a young woman,

21  defendant lived away from Oak Bottom but would return to visit

22  often.  Decision at 9.  By April of 1983 at the latest, defendant

23  moved to her present location, approximately fifty yards to the

24  north of Bessie's home located on Allotment 280.  Decision at 9;

25  ER Tab 5, RT of May 23, 2005 trial proceedings, at 36:24-37:11.

26  ////

7

**C.    THE MAGISTRATE JUDGE'S DECISION**

The magistrate judge concluded that there was not sufficient continuous occupancy by defendant and her lineal ancestors to establish title.  Continuous occupancy could not be established for several reasons.

First, the magistrate judge concluded that Bessie only lived in the Oak Bottom areas "intermittently" until 1926.  Decision at 7.  The magistrate judge found that Bessie lived in Hoopa while attending school and worked in Forks of Salmon, Orleans and other locations during her adulthood and prior to 1926.  "Bessie was also displaced for an unknown period of time from the Oak Bottom area as a result of mining activity in the 1900s, but she apparently returned to Oak Bottom on a full time basis in approximately 1926."  Decision at 7:12-18.  The magistrate judge stated that he was "unable to determine if Bessie's absences before 1926 were inconsequential."  Id. at 8.  "Certainly Bessie's schooling, employment and involuntary displacement by the miners were not events of short duration or degree."  Id.  Indeed, "little information was offered concerning the duration and degree of her occupancy prior to 1926."  Id. at 7, n. 7.

Second, the magistrate judge found that defendant herself did not continuously live on the property at issue.  The magistrate judge concluded that defendant's occupancy "can be traced to three separate locations.  During her childhood, she resided on Allotment 280 with Bessie in her home....between 1981 and April 1983, she camped infrequently in a camp trailer near the river, and in April

1  1983, she moved to her present location approximately fifty yards

2  above, or to the north of Bessie's home."  Decision at 9:4-11.

3      The present site where defendant now lives was the former

4  location of her great-great grandmother's (Mahkhawa'da) home.  The

5  magistrate judge found that Mahkhawa'da's "occupancy was broken

6  when she was expelled by white miners which may have occurred early

7  in the 1900's since Joe Wilson [a miner] was already occupying her

8  home prior to 1915.  Ellen Goodwin's [a Karuk tribe member]

9  occupancy terminated when she moved at the age of 15 in 1929.  The

10 defendant did not move onto the property until 1983.  A period of

11 fifty-three years remains unaccounted for."  Decision at 13, n 18.

12     Third, the magistrate judge explained that the evidence

13 indicated that "only nominal agriculture, husbandry or gardening

14 activity occurred at the Defendant's residence during her

15 occupancy" and that the area in question was never enclosed.

16 Decision at 11.  "No fence or enclosure was ever constructed to

17 serve as a boundary either at, or near the defendant's residence."

18 Id.

19     Finally, the magistrate judge found that the land where

20 defendant now resides was not occupied by Bessie.  The magistrate

21 judge explained:

22         Although there is no reason to disbelieve that Bessie
           freely used and had access to the land surrounding her
23         home . . . such uses could not be considered
           inconsistent with any other individual's right to use
24         National Forest System land. To adopt defendant's
           argument that her occupancy was simply an extension of
25         Bessie's would translate into individual aboriginal
           claims being created by "spin-off" or "sprouting."
26         Certainly no case law supports this notion, but more

1    important, common sense would not permit such an
     expansion of Cramer or Dann III. Otherwise, entire
2    villages or communities could be created by simply
     occupying an area exterior to an existing Native
3    American allotment.

4    Decision at 14:3-12.

5    The magistrate judge also held that any aboriginal right the

6    Tripp family has in the land at issue was extinguished by the

7    following events:

8        (1) the failure of anyone in the Karuk Tribe to file a

9        claim for land under the California Land Claims Act of

10       1851; (2) designation of the land in question as the

11       Klamath National Forest; (3) payment of compensation to

12       the Karuks for their loss of land; or (4) inclusion of

13       the area within the Wild and Scenic River

14       corridor. [16 U.S.C. § 1271].

15   Decision at 14.

16                              **II.**

17                      **STANDARD OF REVIEW**

18   **A.    CLEAR ERROR & DE NOVO REVIEW**

19   Where a district court reviews a conviction by a magistrate

20   judge, the standard of review is the same as when a court of

21   appeals reviews the judgment of a district court. See Fed. R.

22   Crim. P. 58(g)(2)(D).  The reviewing court reviews the trial

23   court's findings of fact for clear error.  Burlington Northern,

24   Inc. v. Weyerhaeuser Co., 719 F.2d 304, 307 (9th Cir. 1983).  "A

25   finding of fact is deemed clearly erroneous when although there is

26   evidence to support it, the reviewing court is left with a definite

                                10

1  and firm conviction that a mistake has been made." <u>Id</u>.

2  Conclusions of law are reviewed <u>de</u> <u>novo</u>. <u>Id</u>.  Unless a mixed

3  question of fact and law is primarily factual, mixed questions are

4  reviewed <u>de</u> <u>novo</u>. <u>United States v. McConney</u>, 728 F.2d 1195,

5  1199-1204 (9th Cir. 1984) (en banc), <u>abrogated on other grounds by</u>

6  <u>Pierce v. Underwood</u>, 487 U.S. 552 (1988); <u>Wilcott v. Matlack, Inc.</u>,

7  64 F.3d 1458, 1460 (10th Cir. 1995).  <u>See</u> <u>also</u> <u>United States v.</u>

8  <u>Lex</u>, 300 F.Supp.2d 951, 956 (E.D. Cal. 2003)(Karlton, J.).

9      In the pending case, the court must determine if the questions

10  presented on appeal are primarily factual or legal in nature.  As

11  the Circuit explained:

12          If application of the rule of law to the facts requires
            an inquiry that is essentially factual, -one that is
13          founded   on   the   application   of   the   fact-finding
            tribunal's experience with the mainsprings of human
14          conduct -the concerns of judicial administration will
            favor the district court, and the district court's
15          determination should be classified as one of fact
            reviewable under the clearly erroneous standard.  If, on
16          the other hand, the question requires [the appeals
            court] to consider legal concepts in the mix of fact and
17          law and to exercise judgment about the values that
            animate legal principles, then the concerns of judicial
18          administration will favor the appellate court, and the
            question should be classified as one of law and reviewed
19          de novo . . . .   This is so because usually the
            application   of   law   to   fact   will   require   the
20          consideration of legal concepts and involve the exercise
            of   judgment   about   the   values   underlying   legal
21          principles.

22  <u>McConney</u>, 728 F.2d at 1202 (internal citations omitted); <u>see also</u>

23  <u>United States v. Marbella</u>, 73 F.3d 1508, 1515 (9th Cir. 1996)

24  ("'When a mixed question of law and fact is presented, the standard

25  of review turns on whether factual matters or legal matters

26  predominate.'" (citation omitted)).

1   In the case at bar, the court is presented with mixed

2   questions of law and fact.  As will be discussed at greater length,

3   the court must address how the magistrate judge interpreted the

4   doctrine of individual aboriginal title and how he applied the

5   doctrine to the facts in the record.  It is clear that these

6   questions require the analysis of "legal concepts in the mix of

7   fact and law and to exercise judgment about the values that animate

8   legal principles."  Id.  For this reason, the court reviews de novo

9   the questions involving individual aboriginal title.

10   **B.  HARMLESS ERROR**

11   If it is determined that the judge in a bench trial has made

12   a legal error in the course of convicting a defendant, the error

13   is reviewed using the same harmless error standard that would apply

14   to an erroneous jury instruction.  See Wilson v. United States, 250

15   F.2d 312, 324 (9th Cir. 1957).  When a jury has been given an

16   incorrect instruction of the law, it "requires reversal unless

17   there is no reasonable possibility that the error materially

18   affected the verdict or, in other words, that the error was

19   harmless beyond a reasonable doubt."  United States v. Romo-Romo,

20   246 F.3d 1272, 1274 (9th Cir. 2001).  Thus, in a bench trial where

21   the legal error goes to an element of the offense, the reviewing

22   court does not "become in effect a second jury to determine whether

23   the defendant is guilty."  Neder v. United States, 527 U.S. 1, 19

24   (1999).  Rather, only "where the reviewing court concludes beyond

25   a reasonable doubt that the omitted element was uncontested and

26   supported by overwhelming evidence, such that the jury verdict

12

1  would have been the same absent the error," <u>id</u>. at 17, is the error

2  harmless.   <u>Lex</u>, 300 F.Supp.2d at 963.

3                                   **III.**

4                                 **ANALYSIS**

5       The offense for which defendant was convicted had three

6  elements: (1) occupying or using Forest Service land; (2) for

7  residential purposes; (3) without a special-use authorization or

8  as otherwise authorized by federal law.   <u>Lex</u>, 300 F.Supp. 2d at

9  256.  Defendant maintains that the government failed to prove that

10  she is not "otherwise authorized by Federal law" to inhabit the

11  land.   More specifically, defendant claims that the government

12  failed to establish that she was not entitled to individual

13  aboriginal title.   Defendant also maintains that the magistrate

14  judge erred in refusing to allow her to present evidence that the

15  administrative proceeding which was used to deny her an Indian

16  allotment was unfair and deprived her of her appellate rights.   The

17  court addresses each contention in turn.

18  **A.   DEFENDANT'S CLAIM TO INDIVIDUAL ABORIGINAL TITLE**

19       Before reaching the merits of defendant's claim, the court

20  must address, as a threshold matter, the burden of proof at trial.

21  The magistrate judge concluded that establishing individual title

22  was an affirmative defense and not an element of the crime.[3]   The

23  _____

24       [3]    <u>See</u>, <u>e.g.</u>, "[t]he remaining portion of the trial
   essentially centered on Defendant's <u>affirmative defense</u> that her
   occupancy was 'otherwise authorized by federal law or regulation.'"
25  Decision at 3:22-13 (emphasis added); "[t]he Defendant had the
   burden of going forward with these <u>affirmative defenses</u> since they
26  were not elements of the case in chief."  Decision at 4:2 (emphasis

1  court cannot agree.

2      As defendant properly points out, on a prior occasion the

3  court has established that "without a special-use authorization or

4  as otherwise authorized by federal law" is an element of the crime

5  charged.  Lex, 300 F.Supp.2d at 956.  As an element of the crime,

6  it was not defendant's burden to establish this element, rather the

7  burden was upon the government.  In re Winship, 397 U.S. 358, 364

8  (1970).  The burden was on the government to prove beyond a

9  reasonable doubt that defendant was not authorized by federal law

10  to use the land in question.

11      That said, the court determines that this mistake constitutes

12  harmless error, as the outcome would have been the same even absent

13  the error.  Even if individual title is construed as an affirmative

14  defense, the final burden of proof is with the government.  It is

15  well-established that when a defendant raises an affirmative

16  defense, the burden shifts back to the prosecution to "disprove

17  every element of the affirmative defense beyond a reasonable

18  doubt."  United States v. Gonsalves, 675 F.2d 1050, 1054 (9th Cir.

19  1982).  Here, it is clear that defendant did in fact raise the

20  affirmative defense of individual title, and thus, the burden

21  shifted back to the government to disprove defendant's entitlement

22  to individual title.  Therefore, whether viewing individual title

23  as an element of the crime or as an affirmative defense, the

24  government ultimately bore the burden of proving that defendant did

25  _____

26  added).

1  not have individual title.  In the case at bar, the magistrate

2  judge concluded that there was proof beyond a reasonable doubt that

3  the defendant did not have authorization to live on the land.

4  Therefore, the magistrate judge's mischaracterization of the burden

5  was harmless.  The court now turns to the merits of the appeal.

6          **1.   The Doctrine of Individual Aboriginal Title**

7          The doctrine of individual aboriginal title grew out of the

8  doctrine of tribal aboriginal title.  "Aboriginal title is a term

9  of art used to describe an Indian possessory interest in land which

10  Indians have inhabited since time immemorial."  <u>County of Oneida</u>

11  <u>v. Oneida Indian Nation</u>, 470 U.S. 226, 234 (1985)(internal

12  citations omitted).  Aboriginal title may be extinguished by the

13  federal government at any time.  <u>United States v. Gemmill</u>, 535 F.2d

14  1145, 1147 (9th Cir. 1976), <u>cert. denied</u>, 429 U.S. 982 (1976).

15  "Congress' power to extinguish aboriginal title is supreme,

16  'whether it be done by treaty, by the sword, by purchase, by the

17  exercise of complete dominion adverse to the right of occupancy,

18  or otherwise. . . .'"  <u>United States v. Santa Fe Pacific R.R. Co.</u>,

19  314 U.S. 339, 347 (1941).

20          Title to property of a tribe usually vested in the tribe and

21  not the individual tribal member.  <u>See</u> Felix Cohen, <u>Handbook of</u>

22  <u>Federal Indian Law</u>, 1038-39 (2005).  However, in 1923, the Supreme

23  Court discussed the federal government's policy of respecting the

24  Indian right of occupancy, noting that the policy "applies to

25  individual Indian occupancy as well."  <u>Cramer v. United States</u>, 261

26  U.S. 219, 227 (1923).  In <u>Cramer</u>, the Court held that three

1   individual Native Americans who had occupied 175 acres of public

2   land continuously since 1850 had individual title to the land they

3   had actually occupied and used.  The court explained that the right

4   was confined to the "lands actually enclosed . . . or having been

5   improved."  <u>Id</u>. at 228.

6        In 1985, the Supreme Court again recognized that individual

7   aboriginal title may survive even when tribal title has been

8   extinguished.  <u>United States v. Dann</u>, 470 U.S. 39 (1985)("<u>Dann</u>

9   <u>II</u>").  The Supreme Court, however, left it to the district courts

10  and courts of appeals to define the meaning of individual

11  aboriginal title.

12       On remand, the Ninth Circuit explained that "there is no

13  theoretical reason why individuals could not establish aboriginal

14  title in much the same manner that a tribe does."  <u>United States</u>

15  <u>v. Dann</u>, 873 F. 2d 1189, 1196 (9th Cir. 1989) ("<u>Dann III</u>").  The

16  court established a standard by which to determine if individual

17  aboriginal title exists:

18            An individual might be able to show that his or her
             lineal ancestors held and occupied, as individuals, a
19            particular tract of land, to the exclusion of all
             others, from time immemorial, and that this title had
20            never been extinguished.

21  <u>Dann III</u>, 873 F.2d at 1196.  The <u>Dann III</u> court explained that the

22  plaintiffs, the Dann sisters, "must show actual possession by

23  occupancy, inclosure, or other actions establishing a right to the

24  lands to the exclusion of adverse claimants."  <u>Id</u>. at 1199.  The

25  court concluded that the Dann sisters had acquired individual

26  aboriginal use rights to graze cattle and horses on open range

1  lands later incorporated into grazing district.  The court

2  determined that these individual aboriginal rights had been

3  acquired and continuously exercised by the Danns' lineal ancestors

4  before the withdrawal of the lands from open grazing under the

5  Taylor Grazing Act. Id.

6      The Dann III standard has been directly applied in only two

7  cases and in both, the courts determined that individual title did

8  not exist.  In United States v. Kent, a case very similar to the

9  case at bar, Kent, a Native American, was convicted of unauthorized

10 residential occupation of land in the Klamath National Forest.  The

11 District Court concluded, and the Ninth Circuit agreed, that even

12 though Kent had ancestral ties to the particular site, no ancestors

13 had occupied the land between 1870 and 1984, when Kent established

14 occupancy.  United States v. Kent, 679 F.Supp. 985, 987 (E.D. Cal.

15 1987)(Schwartz, J.); see also 945 F.2d 1441, 1444 (9th Cir. 1991).

16 The Circuit, did, however, affirm that a Native American could

17 establish individual aboriginal title if she can show that "she or

18 her lineal ancestors continuously occupied a parcel of land, *as*

19 *individuals*, and that the period of continuous occupancy commenced

20 before the land was withdrawn for purposes of settlement." Id.

21     The one other case to directly address the applicability of

22 individual aboriginal title was a district court case.   In

23 Pai'Ohana v. United States, a family of native Hawaiians brought

24 action under the Quiet Title Act asserting rights to use and occupy

25 property within the Kaloko-Honokohau National Historic Park.

26 ////

1   Unlike Kent, the Pai family had resided on and utilized the land

2   for generations prior to the creation of the historic park.  The

3   District Court, however, found that the family did not establish

4   exclusive possession as the Pai family had not yet acted to exclude

5   others from the area.  Pai'Ohana v. United States, 875 F.Supp. 680,

6   697 (D. Haw. 1995).  The district court also concluded that the

7   establishment of the park, by Congress, accompanied by compensatory

8   options and disclaimers, clearly and effectively extinguished any

9   individual aboriginal title the Pai family may have had.  Id. at

10  698.

11        **2.    The Nature of Defendant's Occupancy & Individual Title**

12        The court must determine if the magistrate judge erred in

13  concluding that defendant did not establish individual aboriginal

14  title to the land in question.  The court first addresses the

15  question of continuous occupancy, one of the key elements of the

16  Dann III test.

17        For the reasons explained herein, the court concludes that the

18  magistrate judge carefully considered the facts before him when he

19  found that defendant failed to establish continuous occupancy.  The

20  facts presented demonstrate that there was some form of continuous

21  contact with the land in question over time.  However, without

22  more, it is impossible for the court to conclude that this contact

23  constituted the type of "occupancy" envisioned by the Dann III,

24  Kent and Cramer courts.

25  ////

26  ////

a.   <u>The Meaning of "Occupancy" within the Context of Individual Title</u>

Unlike the doctrine of tribal title, the concept of individual title is not well-developed.  As the Circuit stated in <u>Dann III</u>, "[i]ndividual aboriginal title is by no means a well-defined concept."  <u>Dann III</u>, 873 F.2d at 1195.  Indeed, one term left undefined is the meaning of "occupancy" within the context of individual title.  While there is a small body of case law explaining the definition of occupancy in the context of <u>tribal</u> title, there is little guidance as to what constitutes "occupancy" in the context of individual title.

The <u>Dann III</u> test, as articulated now, sets forth no clear parameters as to what type of contact with a piece of land is sufficient to constitute "occupancy."  To determine the meaning of "occupancy," the court looks to the language and reasoning of the very few cases that address individual title.

Beginning with <u>Cramer</u>, the Supreme Court recognized that there has always been a governmental policy favoring the settlement of Native Americans:

> It is true that this policy has had in view the original nomadic tribal occupancy, but it is likewise true that in its essential spirit it applies to individual Indian occupancy as well; and the reasons for maintaining it in the latter case would seem to be no less cogent, since such occupancy being of a fixed character lends support to another well understood policy, namely, that of inducing the Indian to forsake his wandering habits and adopt those of civilized life.

<u>Cramer</u>, 261 U.S. at 227.  As one scholar noted, "<u>Cramer</u> reflects the policies of individualism and assimilation."

1   John W. Ragsdale, Jr., <u>Individual Aboriginal Rights</u>, 9 Mich. J.

2   Race & L. 323, 348 (2004).  The <u>Cramer</u> court clearly limited title

3   to land actually used.  "[T]heir [Indians] rights are confined to

4   the limits of actual occupancy and cannot be extended

5   constructively to other lands never possessed or claimed, simply

6   because they form part of the same legal subdivisions." <u>Cramer</u>,

7   261 U.S. at 234.  "The claim for Indians is based on occupancy

8   alone, and the extent of it is clearly fixed by the inclosure,

9   cultivation and improvements." <u>Id</u>.  The court went on to cite the

10  following passage from <u>Garrison v. Sampson</u>, in support of its

11  holding:

12          There was a house and corral on the land. Of these he
            may be said to have been in the actual occupancy. But we
13          cannot see from the proofs any right of possession to
            the whole of the quarter section, or even any claim to
14          it. We do not understand that the mere fact that a man
            enters upon a portion of the public land, and builds or
15          occupies a house or corral on a small part of it, gives
            him any claim to the whole subdivision, even as against
16          one entering upon it without title . . . . But merely
            going on waste and unenclosed land, and building a house
17          and corral, and even subsequently cutting hay on a part,
            did not extend his possession to the whole of the 160
18          acres.

19  <u>Garrison v. Sampson</u>, 15 Cal. 93, 95 (Cal. 1860).

20      Almost sixty years later, the <u>Dann III</u> court recognized that

21  <u>Cramer</u> "carefully restricted" individual rights to land that was

22  "actually enclosed and occupied by the individual Indians." <u>Dann</u>

23  <u>III</u>, 873 F.2d at 1199 (citing <u>Cramer</u>, 261 U.S. at 234-36).  The

24  <u>Dann III</u> court then held that "to establish such an individual

25  right of occupancy, the Danns must show actual possession by

26  occupancy, inclosure, or other actions establishing a right to the

1  lands to the exclusion of adverse claimants." <u>Id</u>.

2      In <u>Kent</u>, the District Court again recognized that in <u>Cramer</u>,
3  title had been limited to "the 175 acres . . . enclosed by fencing,
4  improved with various permanent structures and cultivated." <u>Kent</u>,
5  679 F.Supp. at 987.  The District Court went on to conclude that
6  even though Kent "lives in a trailer on the site and has planted
7  a garden, she has not enclosed the area she claims with fencing or
8  erected permanent structures.  Thus both the degree and duration
9  of the occupancy in this case is much less than in <u>Cramer</u>." <u>Kent</u>,
10 679 F.Supp. at 987.  The Court of Appeals affirmed the conviction
11 and again reiterated that title is applicable "only for those
12 Indians who have <u>maintained</u> a presence on that land." <u>Kent</u>, 945
13 F.2d at 1444 (emphasis in original).

14     The <u>Kent</u>, <u>Dann III</u>, and <u>Cramer</u> decisions suggest that
15 occupancy in the context of the individual is fixed in nature, and
16 is "carefully restricted" to the land "actually enclosed and
17 occupied by the individual Indians." <u>Dann III</u>, 837 F.2d at 1199.
18 Moreover, it is appropriate for the court to examine the "degree
19 and duration" of the occupancy.  <u>Kent</u>, 679 F.Supp. at 987.  In
20 short, the language of these cases, especially when viewed in light
21 of the policies behind individual title, establish that occupancy
22 has a restricted meaning in the context of individual title.

23     Defendant argues that the meaning of occupancy should be
24 viewed in light of Native American culture and tradition.
25 Defendant maintains that her "ancestors' use of the land for
26 activities that are part of traditional Native American rather than

21

European culture are valid ways of demonstrating aboriginal title."

Def.'s Reply at 8.   Indeed, in <u>Mitchel v. United States</u>, the

Supreme Court remarked:

> Indian possession or occupation was considered with reference to their habits and modes of life; their hunting grounds were as much in their actual possession as the cleared fields of the whites; and their rights to its exclusive enjoyment in their own way and for their own purposes were as much respected, until they abandoned them, made a cession to the government, or an authorized sale to individuals.

<u>Mitchel</u>, 34 U.S. (9 Pet.) 711, 746 (1835).[4]

The court is sympathetic to the argument that the meaning of "occupancy" should reflect Native American culture and tradition. That said, the cases which recognized this consideration are cases in which tribal title was at issue, and not individual title. Tribal title is a distinct and separate doctrine pertaining to entire tribes of Native Americans.   <u>See</u> Cohen, <u>Handbook on Federal Indian Law</u>, at 966 (2005) ("Tribal property may be formally defined as property in which an Indian tribe has a legally enforceable

---

[4]   <u>See</u> <u>also</u> <u>Sac & Fox Tribe of Indians v. United States</u>, 383 F.2d 991, 998, 179 Ct. Cl. 8 (Ct. Cl.), <u>cert. denied</u>, 389 U.S. 900 (1967) (for the purposes of aboriginal title, "[t]he courts have construed the terms 'use and occupancy' requirement of Indian title to mean use and occupancy in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers."); <u>Spokane Tribe of Indians v. United States</u>, 163 Ct. Cl. 58, 66-67 (Ct. Cl. 1963) (tribe had aboriginal title not only to areas in which there were permanent homes but also areas that were traditionally used on a seasonal basis); <u>United States v. Seminole Indians of the State of Florida</u>, 180 Ct. Cl. 375, 385 (1967)("use and occupancy" for purposes of aboriginal title can include intermittent use of the land for hunting and gathering where that is consistent with traditional Native American use of the land).

1  interest.  It must be distinguished, on the one hand, from property

2  of individual Indians.").  The individual title cases suggest that

3  "occupancy" means something different than in the context of tribal

4  title.  Therefore, the court cannot freely borrow terms and

5  definitions from tribal title cases.

6  ### b.   Occupancy of the Land at Issue

7       In reviewing the record, it is clear that defendant's

8  ancestors had some form of contact with the property at issue.

9  This contact, however, shifted and changed over time and the nature

10 of the contact, at times, was unknown and unclear.  While there is

11 certainly no requirement in the Dann III test that the use of the

12 land remain the same over time, in the case at bar, it is not clear

13 if there was ever sufficient continuous occupancy to establish

14 title.  A review of the facts illustrate the court's position.

15      Defendant's great-great-grandmother (Mahkhawa'da) lived in a

16 cabin on the home site where defendant now lives.  ER Tab 15,

17 Def.'s Ex. R, at 1.  Some time in the early 1900's, Mahkhawa'da was

18 driven off the land by miners.  Mahkhawa'da returned to her home

19 site, however, some unspecified number of years later.  RT at

20 121:5-6.[5]

21 _____

22      [5]   The court notes that the magistrate judge erred in
   concluding that continuous occupancy was "broken when [Mahkhawa'da]
23 was expelled by the white miners."  As defendant correctly notes,
   in the context of both tribal and individual aboriginal title,
24 title to a piece of land may only be extinguished by Congress and
   not by actions of third parties, such as miners.  See Turtle
25 Mountain Band of Chippewa Indians v. United States, 490 F.2d 935,
   945 (Ct. Cl. 1974)("the Constitution vests the power to deal with
26 Indian tribes in Congress, and included in that power is the
   exclusive right to extinguish Indian title.  The sole and plenary

1   The facts are not clear as to the occupancy of defendant's

2   current home site after Mahkhawa'da passed away.  It is apparent

3   that Bessie lived near by (on what is now Allotment 280), ER Tab

4   5, Def.'s Ex. R, at 2, and used much of the area around her home

5   to "cut wood, cut poles for use in construction, gathered tea,

6   mushrooms, acorns, roots and basket-making materials."  ER Tab 5,

7   RT of May 23, 2005 trial proceedings, at 107, 109.  It is also

8   clear that at various points in time, Bessie and other members of

9   the family would garden, raise livestock and gather fruit from the

10  land which is now defendant's residence.  Id. at 65-66, 109.

11  Bessie and her family viewed defendant's current residence as their

12  family property and were successful at keeping strangers off the

13  land they viewed as theirs.  Id. at 68, 124.

14      What remains unclear is the extent to which the land that is

15  now defendant's residence was actually used by her ancestors.  The

16  facts are not clear as to whether Bessie and her family used the

17  land on a daily basis, weekly basis or yearly basis.  Much of the

18  testimony at trial revealed that Bessie and her family consistently

19  and continuously occupied various parts of land in the Oak Bottom

20  ——————————————————————

21  power of Congress to deal with matters of Indian title has long
    been recognized.")(internal citations omitted); United States v.

22  Santa Fe P. R. Co., 314 U.S. 339, 354 (1941)("[The Walapais']
    forcible removal . . . was not pursuant to any mandate of Congress.

23  It was a high-handed endeavor to wrest from these Indians lands
    which Congress had never declared forfeited.  No forfeiture can be
    predicated on an unauthorized attempt to effect a forcible

24  settlement on the reservation . . . .").  Nonetheless, this error
    was harmless.  Even if Mahkhawa'da had lived on the defendant's

25  current homesite for her entire life, the facts still do not set
    forth the type of occupancy envisioned by the Dann and Cramer

26  courts.

1  area for gardening, gathering, hunting and other daily tasks.  That

2  said, the evidence sheds little light onto how Bessie and

3  defendant's other ancestors specifically used the land where

4  defendant now resides.

5       The facts also leave questions about the extent to which

6  Bessie actually lived in the Oak Bottom area.  Between 1899 and

7  1926, Bessie went to school in Hoopa.  S.E.R. Tab 5, at 55, 158-59.

8  She later got married and often join her husband, a miner, at the

9  mines where he worked.  Id. at 56; 158.  The facts reveal that

10 Bessie sporadically return to Oak Bottom,[6] but it is not clear if

11 she returned to what is now Allotment 280 or if she also returned

12 to the area that is now defendant's claimed home.  The magistrate

13 judge was not in error when he concluded that "this court is unable

14 to determine that Bessie's absences before 1926 were

15 inconsequential."  Decision at 8.

16      The degree and duration of defendant's occupancy of her

17 current residence is also not clear.  The magistrate judge

18 correctly summarized defendant's occupancy at the Oak Bottom area:

19 "During her childhood, she resided on Allotment 280 with Bessie in

20 her home....between 1981 and April 1983, she camped infrequently

21 in a camp trailer near the river, and in April 1983, she moved to

22 her present location approximately fifty yards above, or to the

23 north of Bessie's home."

24

25      [6]  The magistrate judge noted that "evidence was adduced at
   trial that Bessie's occupation at Oak Bottom prior to 1926 may have
26 been limited to summers."  Decision at 7, n. 7.

In short, the facts reveal that the degree and duration of the occupancy of defendant's current residence changed over time. While it may be that this type of occupancy is consistent with tribal title (and Native American traditions and customs), the contact between defendant, her ancestors and her current property is, without more, insufficient to establish individual title. Under the doctrine of individual title, "occupancy" requires something more than what is established in the case at bar.

As the magistrate judge correctly noted, the "historical and aboriginal ties of the Karuk Tribe to Oak Bottom cannot be denied, but Defendant's attempt to weave tribal history into an individual aboriginal claim simply ignores the continued occupancy requirement by lineal ancestors under Cramer and Dann III . . . ." Decision at 13.

As discussed previously, occupancy refers to land "clearly fixed by . . . inclosure, cultivation and improvements." Cramer, 261 U.S. at 234.   To establish title, an individual must show "actual possession by occupancy, enclosure other actions." Dann III, 873 F.2d at 1199.   In the case at bar, the evidence does not reflect this type of occupancy.   There was nothing fixed about defendant's ancestors' use of the land.   There were no enclosures or other forms of demarcating the property.   There was also no evidence that the property was continuously cultivated or improved. Evidence that Bessie and her family occasionally gardened and collected fruit on the land does not constitute cultivation and improvement as envisioned by the Dann III and Cramer courts.   In

1  short, the nature and extent of defendant's ancestors' contact with

2  the land was insufficient to support title.[7]

3      Based the facts as presented at trial and the law governing

4  individual title, the court finds that the magistrate judge's

5  decision was not in error.  De novo review of the facts support the

6  magistrate judge's finding that the absences in occupancy by

7  defendant and her ancestors were such that "continuous occupancy"

8  could not be established.  In short, the magistrate judge carefully

9  considered the entire situation when he determined that the

10 defendant did not have individual title to the land in question.

11      Given that the magistrate judge did not err in finding that

12 there was no continuous occupancy, the court need not reach the

13 question of whether title was ever extinguished.  Since there was

14 no title to begin with, the question of extinguishment becomes

15 irrelevant.

16 **B.    EXCLUSION OF EVIDENCE REGARDING ALLOTMENT DENIAL**

17      Defendant contends that the magistrate judge erred in granting

18 the government's motion in limine to exclude evidence of

19 defendant's application and denial of an Indian allotment.  Def.'s

20 Opening Br. at 42.  Defendant sought to introduce evidence that the

21 denial of her application for an allotment was arbitrary and

22

23      [7]  The court is also mindful that to find otherwise would lead
     to even more ambiguity in the law of individual title.  As
24   discussed previously, the individual title cases suggest that title
     is to be limited in scope to only land that was actually used.  To
25   hold that occasional gardening, hunting and animal husbandry
     constitutes "occupancy" would be to suggest that there is no limit
26   on the meaning of "occupancy" and that the most minimal activity
     (such as planting one tree) could constitute "occupancy."

capricious.

An order precluding the admission of evidence is an evidentiary ruling and is reviewed for abuse of discretion. United States v. Brooke, 4 F.3d 1480, 1487 (9th Cir. 1993). Under that standard, "a reviewing court cannot reverse the trial court unless it has a definite and firm conviction that the lower court committed a clear error of judgment." Sandpiper Village Condominium Ass'n, Inc. v. Louisiana-Pacific Corp., 428 F.3d 831, 858 (9th Cir. 2005); see also United States v. Plainbull, 957 F.2d 724, 725 (9th Cir. 1992)(court "abuses its discretion" if it commits clear error or does not apply the correct law).

During the May 18, 2005 Status Conference, the government moved to exclude evidence of Ms. Lowry's denial of an Indian allotment by the Forest Service. The government claimed defendant was attempting to have the denial reviewed six years later when her appropriate remedy was to file an appeal in Federal District Court pursuant to 25 U.S.C. § 345. RT May 18, 2005 Status Conf. at 1:23-25.[8] By failing to appeal the denial to the district court, the

---

[8]   25 U.S.C. § 345 states:

All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper district court of the United States; and said district courts are given jurisdiction to try and determine any

28

1   government claimed defendant should not be allowed to raise the

2   issue at trial.  _Id_. at 2:5-8.

3        In opposition, defendant argued that "but for the arbitrary

4   and capricious activity by the forest service, there would be no

5   trespass." _Id_. at 5:5-6.  The defendant maintained that the Forest

6   Service considered impermissible factors in denying the application

7   and told defendant there was no right to appeal the denial of an

8   allotment, although this was not true.  _Id_. at 3:9-4:20.

9        The magistrate judge granted the government's _in limine_

10  motion, finding that any proof defendant could present about living

11  on the land with authorization would have to be because "[she] got

12  an allotment, not because [she] should have gotten an allotment."

13  _Id_. at 11:24-25.  In his written decision, the magistrate judge

14  explained that although he previously ruled to exclude the

15  evidence, "much of this evidence was received anyway by way of

16  stipulation, or otherwise included within the documentation

17  received in evidence, the Court will nevertheless address the

18  _____

19       action, suit, or proceeding arising within their
         respective jurisdictions involving the right of any
20       person, in whole or in part of Indian blood or descent,
         to any allotment of land under any law or treaty (and in
21       said suit the parties thereto shall be the claimant as
         plaintiff and the United States as party defendant); and
22       the judgment or decree of any such court in favor of any
         claimant to an allotment of land shall have the same
23       effect, when properly certified to the Secretary of the
         Interior, as if such allotment had been allowed and
24       approved by him, but this provision shall not apply to
         any lands now held by either of the Five Civilized
25       Tribes, nor to any of the lands within the Quapaw Indian
         Agency: Provided, That the right of appeal shall be
26       allowed to either party as in other cases.

arguments." Decision at 17.  He went on to conclude that the court

did not have jurisdiction to "adjudicate Defendant's claims as to

an allotment . . . .   To conclude that Defendant is entitled to the

land she occupied under any of the theories proffered would result

in altering the lands included within the Klamath National Forest

. . . .   The court is without power under the Constitution to take

such action."  Id. at 18.

       This court finds that the magistrate judge did not abuse his

discretion in excluding the evidence.  A finding that defendant had

been denied due process in the allotment application process would

not inevitably lead to the conclusion she was entitled to an

allotment and thus would not have been trespassing.  The magistrate

judge's concern that this was a "quantum leap" is well-taken.  Id.

at 9:2.  The only way for the excluded evidence to establish that

defendant did have authorization on the land would be for the

magistrate judge to conclude that she was arbitrarily denied due

process in the application process and to grant an allotment to

defendant.  The magistrate judge correctly noted that he did not

have the jurisdiction to make that decision.

       The court must address a slight wrinkle in this conclusion.

As discussed in Section III(A), infra, the magistrate judge

viewed individual title as an affirmative defense.  If an

exclusionary order precludes the presentation of an affirmative

defense, it is reviewed de novo.  United States v. Biggs, 441 F.3d

1069, 1070 n.1 (9th Cir. 2006)(citing United States v. Ross, 206

F.3d 896, 898-899 (9th Cir. 2000)).

1    While the magistrate judge at the Status Conference framed the

2  evidence as part of an affirmative defense, this was in error.  As

3  discussed previously, proving that defendant lived on the land

4  without authorization was an element of the crime.  Thus, the

5  magistrate judge's order precluding the admission of evidence is

6  an evidentiary ruling and is reviewed for abuse of discretion.

7  United States v. Brooke, 4 F.3d 1480, 1487 (9th Cir. 1993).

8    That said, even if this court were to conclude that individual

9  title was an affirmative defense, were to conduct a de novo review

10  of the magistrate judge's decision and were to conclude that he

11  erred in excluding the evidence, any error would be harmless.  As

12  explained earlier, even if title was an affirmative defense, the

13  government had the ultimate burden of proof to demonstrate

14  defendant was not authorized to stay on the land.  The government

15  met that burden.  Accordingly, the magistrate judge did not commit

16  clear error or apply the wrong law in granting the government's in

17  limine motion.

18                                **IV.**

19                               **ORDERS**

20    For the above stated reasons, the defendant's conviction is

21  AFFIRMED.  The sentence is hereby STAYED pending appeal to the

22  U.S. Court of Appeals for the Ninth Circuit.

23    IT IS SO ORDERED.

24    DATED: July 24, 2006.

25                    LAWRENCE K. KARLTON
                      SENIOR JUDGE

26                    UNITED STATES DISTRICT COURT

31